# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
John O. Juroszek

## KIM v JPMORGAN CHASE BANK, NA

Docket No. 144690. Argued October 10, 2012 (Calendar No. 9). Decided December 21, 2012.

Euihyung and In Sook Kim brought an action in the Macomb Circuit Court against JPMorgan Chase Bank, N.A., seeking to set aside a sheriff's sale of their home. Plaintiffs had obtained a loan from Washington Mutual Bank to refinance their home and granted Washington Mutual a mortgage interest in the property to secure the loan. The federal Office of Thrift Management subsequently closed Washington Mutual and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver for the bank. Defendant acquired Washington Mutual's assets, including loans and loan commitments, pursuant to a purchase and assumption agreement that it reached with the FDIC. After plaintiffs defaulted on their loan payments, defendant foreclosed on the property by advertisement and purchased the property at the sheriff's sale. Both parties moved for summary disposition. Plaintiffs argued in part that defendant had failed to comply with the statutory foreclosure-by-advertisement requirements and that as a result the foreclosure sale was void *ab initio*. The court, Richard L. Caretti, J., granted summary disposition in favor of defendant, finding that because defendant had acquired plaintiffs' mortgage by operation of law, defendant was not required to record the mortgage assignment before beginning foreclosure-by-advertisement proceedings. The Court of Appeals, DONOFRIO, P.J., and STEPHENS and RONAYNE KRAUSE, JJ., reversed, concluding that because defendant was not the original mortgagee and had acquired the loan by assignment rather than by operation of law, defendant was obligated under MCL 600.3204(3) to record the assignment of plaintiffs' mortgage to it before foreclosing by advertisement. The Court of Appeals determined that defendant's failure to record the assignment rendered the sheriff's sale void *ab initio*. 295 Mich App 200 (2012). The Supreme Court granted defendant's application for leave to appeal. 491 Mich 915 (2012).

In an opinion by Justice MARILYN KELLY, joined by Justices CAVANAGH, MARKMAN, and HATHAWAY, the Supreme Court *held*:

When a subsequent mortgagee acquires an interest in a mortgage through a voluntary purchase agreement with the FDIC, the mortgage has not been acquired by operation of law and that subsequent mortgagee must comply with the provisions of MCL 600.3204 and record the assignment of the mortgage before foreclosing on the mortgage by advertisement. Any defect or irregularity in a foreclosure proceeding results in a foreclosure that is voidable, not void *ab initio*.

1. The FDIC, when acting in its capacity as conservator or receiver of failed depository institutions, acquires by operation of law all rights, titles, powers, and privileges of the failed insured depository institution and title to the books, records, and assets of any previous conservator or other legal custodian of such institution under 12 USC 1821(d)(2)(A). Accordingly, the FDIC succeeded to Washington Mutual's assets, which included plaintiffs' mortgage, by operation of law.

2. Under 12 USC 1821(d)(2)(G), the FDIC may dispose of a failed bank's assets (1) by merging the insured depository institution with another insured depository institution or (2) by transferring, subject to approval by the appropriate federal banking agency, any asset or liability of the institution to another depository institution. A transfer occurs by operation of law when it takes place unintentionally, involuntarily, or through no affirmative action on the part of the transferee. The transfer of Washington Mutual's assets from the FDIC to defendant was an assignment and did not take place by operation of law because defendant acquired Washington Mutual's assets in a voluntary transaction pursuant to 12 USC 1821(d)(2)(G)(i)(II). The FDIC chose to transfer Washington Mutual's assets through the voluntary purchase agreement, not by a merger, which would have effectuated the transfer of assets by operation of law under 12 USC 1821(d)(2)(G)(i)(I).

3. Under MCL 600.3204(3), if the party foreclosing on a mortgage by advertisement is not the original mortgagee, a record chain of title must exist evidencing the assignment of the mortgage to the party foreclosing on the mortgage before the date of sale. Defendant failed to record the assignment of plaintiffs' mortgage before foreclosing on it by advertisement.

4. Defects or irregularities in a foreclosure proceeding result in a foreclosure that is voidable, not void *ab initio*. To set aside a foreclosure-by-advertisement sale on the basis of a failure to follow the foreclosure requirements set forth in MCL 600.3204, the party claiming a defect must demonstrate prejudice by showing that it would have been in a better position to preserve its interest in the property absent the other party's statutory noncompliance. Because defendant failed to record its interest in plaintiffs' mortgage in compliance with MCL 600.3204 before foreclosing on the property by advertisement, the sale was voidable, not void *ab initio* as the Court of Appeals incorrectly determined.

Affirmed in part, reversed in part, and remanded for further proceedings.

Justice MARKMAN, concurring, wrote separately to emphasize that the dissent did not provide an affirmative definition of "operation of law," did not explain the legal significance of its observation that the transaction at issue was "specialized," and did not support its contention that the FDIC's characterization of the transfer should be accorded respectful consideration in light of the fact that this case concerned only Michigan law and that the affidavit submitted was not a product of the standard rulemaking process. Justice MARKMAN would also have offered additional guidance to the trial court concerning the nature of the prejudice that plaintiffs must demonstrate in order to set aside the foreclosure.

Justice ZAHRA, joined by Chief Justice YOUNG and Justice MARY BETH KELLY, dissenting, would have reversed the judgment of the Court of Appeals and held that the FDIC's

transfer of Washington Mutual's assets to defendant occurred by operation of law. Under 12 USC 1821(d)(2)(G)(i)(II), the FDIC is empowered to resolve the business of a failed bank by transferring any asset or liability without any assignment, or consent with respect to that transfer. As stated by the FDIC in an affidavit, the transfers of assets from Washington Mutual to the FDIC, as the receiver, and then almost immediately to defendant occurred by operation of law without an assignment; the transfer was not a simple sale as asserted by the majority. The FDIC's characterization of a transfer under its governing statute should be accorded respectful consideration. Contrary to the majority's conclusion, a transfer by operation of law does not have to be involuntary. Such a rule ignores that other transfers, such as those that occur by intestacy or a joint tenancy, occur by operation of law but require acceptance by the transferee. The transaction between the FDIC and defendant was the legal equivalent of a merger because defendant received the assets and liabilities without an assignment and stepped into Washington Mutual's shoes. Because defendant acquired plaintiffs' mortgage without assignment and by operation of law pursuant to the FDIC's statutory authority, the recording requirements of MCL 600.3204(3) did not apply. Defendant was legally considered the original mortgagee, was not required to record anything in the chain of title, and properly foreclosed on plaintiffs' mortgage by advertisement.

©2012 State of Michigan

# Opinion

Chief Justice:        Justices:

Robert P. Young, Jr.  Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra

FILED DECEMBER 21, 2012

S T A T E   O F   M I C H I G A N

SUPREME COURT

EUIHYUNG KIM and IN SOOK KIM,

  Plaintiffs-Appellees,

v                                                     No. 144690

JPMORGAN CHASE BANK, N.A.,

  Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MARILYN KELLY, J.

At issue in this case is the manner in which defendant JPMorgan Chase Bank, N.A. (Chase), the successor in interest to Washington Mutual Bank (WaMu), acquired plaintiffs' mortgage. Plaintiffs' mortgage was among the assets held by WaMu when it collapsed in 2008 in the largest bank failure in American history.[1] Specifically, we must determine whether defendant acquired plaintiffs' mortgage by "operation of law" and, if

---

[1] See Dash & Sorkin, *Government Seizes WaMu and Sells Some Assets*, NY Times, September 25, 2008, available at <http://www.nytimes.com/2008/09/26/business/26wamu.html?pagewanted=all> (accessed December 20, 2012).

so, whether MCL 600.3204(3), which sets forth requirements for foreclosing by advertisement, applies to the acquisition of a mortgage by operation of law. We asked the parties to address whether, if the foreclosure proceedings that defendant initiated were flawed, the subsequent foreclosure is void *ab initio* or merely voidable.[2]

We hold that defendant did not acquire plaintiffs' mortgage by operation of law. Rather, defendant acquired that mortgage through a voluntary purchase agreement. Accordingly, defendant was required to comply with the provisions of MCL 600.3204. We further hold, differently than did the Court of Appeals, that the foreclosure sale in this case was voidable rather than void *ab initio*. Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand the case to the trial court for further proceedings.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 11, 2007, plaintiffs obtained a loan from WaMu in the amount of $615,000 to refinance their residence. As security for the loan, plaintiffs granted a mortgage on the property to WaMu, which properly recorded it later that month.

When WaMu collapsed on September 25, 2008, the federal Office of Thrift Management closed the bank and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver for its holdings. That same day, the FDIC, acting as WaMu's receiver, transferred virtually all of WaMu's assets to defendant under authority set forth

---

[2] "Void *ab initio*" is defined as "[n]ull from the beginning, as from the first moment when a contract is entered into." Black's Law Dictionary (9th ed). By contrast, "voidable" is defined as "[v]alid until annulled; [especially], (of a contract) capable of being affirmed or rejected at the option of one of the parties." *Id*.

2

in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.[3] Under 12 USC 1821, the FDIC is empowered to transfer the assets of a failed bank "without any approval, assignment, or consent . . . ."[4] However, in this case, it did not avail itself of that authority. Instead, the FDIC sold WaMu's assets to defendant pursuant to a purchase and assumption (P&A) agreement.

Plaintiffs sought a loan modification in 2009 because they were having difficulty making their mortgage payments. They assert that a WaMu representative advised them that they were ineligible for a loan modification because they were not at least three months in arrears on their payments. Plaintiffs claim that on the basis of this information, they deliberately allowed their mortgage to become delinquent to qualify for a loan modification. They further allege that they signed documents to complete the modification and that their attorney assured them that their loan modification had been approved.

Defendant notified plaintiffs in May 2009 that it was foreclosing on their property. Plaintiffs contend that they attempted to ascertain whether the foreclosure notice had been sent in error in light of the purported loan modification and were advised by a WaMu representative "not to worry." Defendant published the required notice of foreclosure in May and June 2009. The property was sold to defendant at a sheriff's sale on June 26, 2009.

---

[3] PL 101-73, 103 Stat 183 *et seq*.

[4] 12 USC 1821(d)(2)(G)(i)(II).

Plaintiffs filed suit on November 30, 2009, seeking to set aside the sale on the ground that they had received a loan modification and that defendant had not bid fair market value for the property at the sale. Defendant responded with a motion for summary disposition. The trial court granted summary disposition to defendant. It ruled that defendant had acquired plaintiffs' mortgage by operation of law. As a consequence, MCL 600.3204(3), which requires that a mortgage assignment be recorded before initiation of a foreclosure by advertisement, was inapplicable.

Plaintiffs appealed, pursuing only their claim that defendant had failed to comply with MCL 600.3204(3) and that, as a result, the foreclosure sale was void *ab initio*. The Court of Appeals agreed. It held that MCL 600.3204(3) applied to defendant because defendant was not the original mortgagee and acquired the loan by assignment rather than by operation of law.[5] It reasoned that the FDIC, as receiver of WaMu's assets, had acquired those assets by operation of law, but not defendant, which had purchased them from the FDIC.[6] Hence, the Court of Appeals held that defendant had a statutory obligation to record the assignment of plaintiffs' mortgage to it before foreclosing by advertisement.[7] Moreover, the Court of Appeals held that defendant's failure to record the assignment rendered the sheriff's sale void *ab initio*.[8] Accordingly, it remanded the case to the trial court for entry of judgment in favor of plaintiffs.

---

[5] *Kim v JPMorgan Chase Bank, NA*, 295 Mich App 200, 207; 813 NW2d 778 (2012).

[6] *Id.*

[7] *Id.* at 208.

[8] *Id.*

4

Defendant filed an application for leave to appeal in this Court. We granted its application.[9]

## II. ANALYSIS

### A. LEGAL BACKGROUND

We review de novo the grant or denial of a motion for summary disposition.[10] We use the same standard to review questions of statutory interpretation.[11]

At the heart of this dispute are the statutory provisions governing the foreclosure of mortgages by advertisement.[12] MCL 600.3204 sets forth the requirements, providing in relevant part:

> (1) Subject to subsection (4) [providing certain exceptions inapplicable to this case], a party may foreclose a mortgage by advertisement if all of the following circumstances exist:
>
> (a) A default in a condition of the mortgage has occurred, by which the power to sell became operative.
>
> (b) An action or proceeding has not been instituted, at law, to recover the debt secured by the mortgage or any part of the mortgage; or, if an action or proceeding has been instituted, the action or proceeding has been discontinued; or an execution on a judgment rendered in an action or proceeding has been returned unsatisfied, in whole or in part.
>
> (c) The mortgage containing the power of sale has been properly recorded.

---

[9] *Kim v JPMorgan Chase Bank, NA*, 491 Mich 915 (2012).

[10] *Briggs Tax Serv, LLC v Detroit Pub Sch*, 485 Mich 69, 75; 780 NW2d 753 (2010).

[11] *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83, 89; 803 NW2d 674 (2011).

[12] MCL 600.3201 *et seq.*

5

(d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage.

\* \* \*

(3) If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale under [MCL 600.3216] evidencing the assignment of the mortgage to the party foreclosing the mortgage.

Thus, as a general matter, a mortgagee cannot validly foreclose a mortgage by advertisement before the mortgage and all assignments of that mortgage are duly recorded.

This common understanding of the requirement of recordation before foreclosure by advertisement was also set forth in a 2004 Attorney General opinion. Our Attorney General stated that "a mortgagee cannot validly foreclose a mortgage by advertisement unless the mortgage and all assignments of that mortgage (except those assignments effected by operation of law) are entitled to be, and have been, recorded."[13] In 2004, the operative language now set forth in MCL 600.3204(3) was found in MCL 600.3204(1)(c).[14]

---

[13] OAG, 2003-2004, No 7147, p 93 (January 9, 2004).

[14] MCL 600.3204, as amended by 1994 PA 397, provided, in relevant part:

(1) A party may foreclose by advertisement if all of the following circumstances exist:

\* \* \*

(c) The mortgage containing the power of sale has been properly recorded and, if the party foreclosing is not the original mortgagee, a record chain of title exists evidencing the assignment of the mortgage to the party foreclosing the mortgage.

6

The general powers of the FDIC in its capacity as conservator or receiver[15] that are germane to this case are set forth in 12 USC 1821. Specifically, 12 USC 1821(d)(2) describes the manner in which the FDIC acquires assets. It provides, in relevant part:

> (A) Successor to institution.—The [FDIC] shall, as conservator or receiver, and *by operation of law*, succeed to—
>
> (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution; and
>
> (ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

Subsection (d)(2) also sets forth the FDIC's authority to dispose of a failed bank's assets, providing in pertinent part:

> (G) Merger; transfer of assets and liabilities.—
>
> (i) In general.—The [FDIC] may, as conservator or receiver—
>
> (I) merge the insured depository institution with another insured depository institution; or
>
> (II) subject to clause (ii), transfer any asset or liability of the institution in default (including assets and liabilities associated with any trust business) without any approval, assignment, or consent with respect to such transfer.

---

Subsequent amendments by 2004 PA 186 and 2009 PA 29 produced the current language.

[15] The Federal Deposit Insurance Act (FDIA), 12 USC 1811 *et seq.*, governs the actions of the FDIC. The FDIA directs the FDIC to operate in two separate and legally distinct capacities: FDIC corporate and FDIC acting as receiver. FDIC corporate functions as an insurer of bank deposits. See 12 USC 1821(a). This function of the FDIC is not at issue here.

7

(ii) *Approval by appropriate Federal banking agency.*—No transfer described in clause (i)(II) may be made to another depository institution . . . without the approval of the appropriate Federal banking agency for such institution.

## B. APPLICATION

Against this backdrop, we consider the manner in which defendant acquired plaintiffs' mortgage and whether the requirements of MCL 600.3204 apply to that acquisition.

## 1. DEFENDANT DID NOT ACQUIRE PLAINTIFFS' MORTGAGE BY OPERATION OF LAW

Two transfers of plaintiffs' mortgage occurred on September 25, 2008. The first, between WaMu and the FDIC, was consummated when the Office of Thrift Management closed WaMu and appointed the FDIC as its receiver. This transfer took place pursuant to 12 USC 1821(d)(2)(A)(i) and (ii), which provide that the FDIC "shall, as conservator or receiver, and *by operation of law*, succeed to . . . all rights, titles, powers, and privileges of the insured depository institution . . . and title to the books, records, and assets of any previous conservator or other legal custodian of such institution." (Emphasis added.) Thus, when the FDIC succeeded to WaMu's assets, which included plaintiffs' mortgage, it did so by clear operation of a statutory provision—12 USC 1821(d)(2)(A). With respect to this transfer, the FDIC acquired plaintiffs' mortgage by operation of law.

But the FDIC only briefly possessed WaMu's assets, including plaintiffs' mortgage. It immediately transferred those assets to defendant. The dispositive question in this case is whether the second transfer of WaMu's assets—the transfer from the FDIC to defendant—took place by operation of law.

8

The seminal case discussing the term "operation of law" in the context of foreclosures by advertisement is *Miller v Clark*.[16]  In *Miller*, a mortgagee died intestate. The Court considered whether the guardian of his heirs was obliged to record an assignment of the mortgage before foreclosing on it by advertisement.  The Court held:

> The authority to foreclose such mortgages by advertisement is purely statutory, and all the requirements of the statute must be substantially complied with.  To entitle a party to foreclose in this manner it is required, among other things, that the mortgage containing such power of sale has been duly recorded; and if it shall have been assigned, that all the assignments thereof shall have been recorded.  And also that the notice shall specify the names of the mortgagor and the mortgagee, and of the assignee of the mortgage, if any.
>
> *The assignments which are required to be recorded are those which are executed by the voluntary act of the party, and this does not apply to cases where the title is transferred by operation of law*; the object of the statute being to restrict the execution of the power to the owner of the legal title to the instrument.[17]

Thus, *Miller* contemplated that a transfer occurs by operation of law when it takes place involuntarily or as the result of no affirmative action on the part of the transferee.

*Miller*'s interpretation of when a transfer occurs by "operation of law" is consistent with Black's Law Dictionary's definition of the expression.  Black's defines "operation of law" as "[t]he means by which a right or a liability is created for a party *regardless of the party's actual intent*."[18]  Similarly, this Court has long understood the

---

[16] *Miller v Clark*, 56 Mich 337; 23 NW 35 (1885).

[17] *Id*. at 340-341 (emphasis added) (quotation marks omitted).  The statute governing foreclosures by advertisement in effect when *Miller* was decided in 1885, 1871 CL 6913, was considerably different from the current statute, MCL 600.3204.

[18] Black's Law Dictionary (9th ed) (emphasis added).

expression to indicate "the manner in which a party acquires rights *without any act of his own*."[19]  Accordingly, there is ample authority for the proposition that a transfer that takes place by operation of law occurs unintentionally, involuntarily, or through no affirmative act of the transferee.

Applying this proposition, we hold that the transfer of WaMu's assets from the FDIC to defendant did not take place by operation of law.  Defendant acquired WaMu's assets from the FDIC in a voluntary transaction; defendant was not forced to acquire them.  Instead, defendant took the affirmative action of voluntarily paying for them.  Had defendant not willingly purchased them, it would not have come into possession of plaintiffs' mortgage.  WaMu's assets did not pass to defendant "without any act of [defendant's] own"[20] or "regardless of [defendant's] actual intent."[21]  Accordingly, the Court of Appeals correctly concluded that defendant did not acquire WaMu's assets by operation of law.

---

[19] *Merdzinski v Modderman*, 263 Mich 173, 175; 248 NW 586 (1933) (emphasis added) (citation and quotation marks omitted); see also *Union Guardian Trust Co v Emery*, 292 Mich 394, 406-407; 290 NW 841 (1940) (holding in a discussion of a constructive trust that, "[w]hile the term 'constructive trust' has been broadly defined as a trust raised by construction of law, or arising by operation of law, as distinguished from an express trust, in a more restricted sense and contradistinguished from a resulting trust it has been variously defined as a trust not created by any words, either expressly or impliedly evincing a direct intention to create a trust, but by the construction of equity in order to satisfy the demands of justice; *one not arising by agreement or intention, but by operation of law*") (emphasis added).

[20] *Merdzinski*, 263 Mich at 175.

[21] Black's Law Dictionary (9th ed).

Defendant and the dissent contend that the transfer occurred by operation of law because, although not a merger, the transfer was analogous to a merger and should be treated as one. We find this reasoning unpersuasive.[22]  12 USC 1821(d)(2)(G)(i)(I) empowered the FDIC to merge WaMu with another financial institution such as defendant. Had a merger occurred under that statutory provision, defendant would have a strong argument that it had merely stepped into the shoes of WaMu. It would have had no need to engage in a transfer of any of WaMu's assets. And the transaction would have occurred without any voluntary or affirmative action by defendant, given that the FDIC may, at its discretion, merge a failed bank with another institution. The transaction could have constituted a transfer by operation of law under traditional banking and corporate law.[23]

---

[22] We also find unpersuasive the FDIC's characterization of the transfer as one that occurred by operation of law. We have given respectful consideration to the FDIC's position, but we do not resort to it for guidance in this matter due to its lack of persuasiveness. In addition, the authorities cited by the dissent in support of its contention that the FDIC's position should be accorded respectful consideration, *post* at 4 n 10, are inapposite. This case is concerned with Michigan law, not federal law. The dispositive issue is whether defendant satisfied MCL 600.3204, which implicates whether the transfer from the FDIC to defendant occurred by operation of law. Whether the transfer occurred by operation of law is governed by Michigan law.

[23] See, e.g., 12 USC 215a(e) ("All rights, franchises, and interests of the individual merging banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the receiving association by virtue of such merger without any deed or other transfer."); MCL 450.1724(1)(b) ("When a merger takes effect, . . . the title to all real estate and other property and rights owned by each corporation party to the merger are vested in the surviving corporation without reversion or impairment.").

11

But here, a merger did not occur. In selling WaMu's assets to defendant, the FDIC relied on a different statutory provision, 12 USC 1821(d)(2)(G)(i)(II), which allows the FDIC to "transfer" the assets and liabilities of failed institutions. Hence, although the FDIC could have effectuated a merger in reliance on subsection (d)(2)(G)(i)(I), it explicitly chose not to do so. Indeed, the FDIC submitted an affidavit to the Court that describes the transaction, specifically citing the subsection of the statute authorizing transfers, rather than the subsection authorizing mergers.[24] Unlike the dissent, we will not conclude that a merger took place when the FDIC so clearly chose to engage in a different type of transaction under a different statutory provision.[25]

In sum, the Court of Appeals correctly held that defendant did not acquire WaMu's assets by operation of law.

---

[24] The affidavit provides, in relevant part:

> 3. As authorized by . . . 12 U.S.C. § 1821(d)(2)(G)(i)(II), the FDIC, as receiver of Washington Mutual, may transfer any asset or liability of Washington Mutual without any approval, assignment, or consent with respect to such transfer.

> 4. Pursuant to the terms and conditions of a [P&A] Agreement between the FDIC as receiver of Washington Mutual and [defendant] . . . [defendant] acquired certain of the assets, including all loans and all loan commitments, of Washington Mutual.

> 5. As a result, on September 25, 2008, [defendant] became the owner of the loans and loan commitments of Washington Mutual by operation of law.

[25] Although the FDIC's affidavit purports that the sale of WaMu's assets to defendant was effected by operation of law, the FDIC may not by unilateral declaration make it so.

## 2. DEFENDANT'S FAILURE TO COMPLY WITH MCL 600.3204(3) RENDERS THE FORECLOSURE OF PLAINTIFFS' PROPERTY VOIDABLE

As noted earlier, MCL 600.3204 sets forth several requirements for foreclosing a property by advertisement. Subsection (3) requires a party that is not the original mortgagee to record the assignment of the mortgage to it before foreclosing. Because defendant acquired plaintiffs' mortgage through a voluntary transfer, and given that it was not the original mortgagee, it was subject to the recordation requirement of MCL 600.3204(3). Having made that determination, we must now decide the effect of defendant's failure to comply with that provision.[26]

With meager supporting analysis, the Court of Appeals concluded that defendant's failure to record its mortgage interest before initiating foreclosure proceedings rendered the foreclosure sale void *ab initio*. It cited one case in support of its holding, *Davenport v*

---

[26] Because we have held that defendant acquired plaintiffs' mortgage through a voluntary transfer, we need not decide whether MCL 600.3204(3) applies to the acquisition of a mortgage by operation of law. The dissent must decide this issue to support its position. In doing so, it acknowledges that changes have been made to the language of the foreclosure-by-advertisement statute during the 127 years since *Miller* was decided. It mentions that both versions "required the recordation of mortgage assignments before foreclosure was permitted." But it overlooks the fact that the 1871 statute required the recordation of assignments only "if [the mortgage] shall have been assigned," 1871 CL 6913, whereas the current statute, MCL 600.3204(3), requires recordation if the foreclosing party "is not the original mortgagee." These are two distinct triggering mechanisms for recordation. Moreover, the fact that in the 1871 statute the recordation requirement was triggered by assignment seems particularly significant. "Assignment" is defined as "**1.** The transfer of rights or property. **2.** The rights or property so transferred." Black's Law Dictionary (9th ed). By contrast, as noted earlier, "operation of law" expresses devolution of a right absent the acts of a party, such as assignment, to obtain them. Thus, the *Miller* Court correctly focused on the voluntariness of transfer and concluded that involuntary transfers by operation of law did not trigger the recording requirement because they did not constitute assignments. The same conclusion cannot be made when construing the language of MCL 600.3204(3).

*HSBC Bank USA*.[27]  There, the plaintiff, who was in default on her mortgage, brought an action to void a foreclosure.  The defendant, who was the successor in interest of the initial mortgagee, had initiated the foreclosure proceeding several days before acquiring its interest in the mortgage.  The trial court granted summary disposition to defendant.

The Court of Appeals reversed the trial court's ruling.  It held that the defendant's failure to comply with MCL 600.3204(1)(d), which requires that a party own some or all of the indebtedness before foreclosing by advertisement, rendered the foreclosure proceedings void *ab initio*.[28]  But it cited not a single case in support of the proposition that the foreclosure was void *ab initio* as opposed to merely voidable.

*Davenport*'s holding was contrary to the established precedent of this Court.  We have long held that defective mortgage foreclosures are voidable.  For example, in *Kuschinski v Equitable & Central Trust Co*,[29] the Court considered a foreclosure undertaken in violation of a restraining order.  The Court held:

> Our attention is called to a few isolated cases where under a different factual set-up, such sales have been held to be void. *The better rule seems to be that such sale is voidable and not void.*  Plaintiff was not misled into believing that no sale had been had because of the order restraining such action.  He knew of the sale and, although he was warned by defendants' attorneys, violated the rule that in seeking to set aside a foreclosure sale, the moving party must act promptly after he becomes aware of the facts upon which he bases his complaint.  The total lack of equity in plaintiff's claim,

---

[27] *Davenport v HSBC Bank USA*, 275 Mich App 344; 739 NW2d 383 (2007).

[28] *Id*. at 347-348.

[29] *Kuschinski v Equitable & Central Trust Co*, 277 Mich 23; 268 NW 797 (1936).

14

his failure to pay anything on the mortgage debt and his laches preclude him from any relief in a court of equity.[30]

Similarly, in *Feldman v Equitable Trust Co*, the Court held that a foreclosure commenced without first recording all assignments of the mortgage is not invalid if the defect does not harm the homeowner.[31] This Court, the Court of Appeals, and the United States District Court for the Eastern District of Michigan have consistently used this interpretation.[32] We continue to adhere to it.

Therefore, we hold that defects or irregularities in a foreclosure proceeding result in a foreclosure that is voidable, not void *ab initio*. Because the Court of Appeals erred by holding to the contrary, we reverse that portion of its decision. We leave to the trial court the determination of whether, under the facts presented, the foreclosure sale of plaintiffs' property is voidable. In this regard, to set aside the foreclosure sale, plaintiffs must show that they were prejudiced by defendant's failure to comply with MCL 600.3204. To demonstrate such prejudice, they must show that they would have been in

---

[30] *Id*. at 26-27 (emphasis added) (citations omitted).

[31] *Feldman v Equitable Trust Co*, 278 Mich 619, 624-625; 270 NW 809 (1937).

[32] See, e.g., *Fox v Jacobs*, 289 Mich 619, 624; 286 NW 854 (1939) (holding that the failure of a foreclosure notice to specify an assignee of the mortgage, as required by statute, did not render the foreclosure sale absolutely void, but only voidable); *Sweet Air Investment, Inc v Kenney*, 275 Mich App 492, 502; 739 NW2d 656 (2007) (holding that a defect in notice renders a foreclosure sale voidable and not void); *Jackson Investment Corp v Pittsfield Prod, Inc*, 162 Mich App 750, 756; 413 NW2d 99 (1987) ("We conclude that the trial court correctly held that the notice defect rendered the [foreclosure] sale voidable and not void."); *Worthy v World Wide Fin Servs, Inc*, 347 F Supp 2d 502, 511 (ED Mich, 2004) ("[E]ven if Defendant failed to comply with the foreclosure notice statute, I would not have sufficient grounds to invalidate the foreclosure sale, because of a lack of prejudice.").

a better position to preserve their interest in the property absent defendant's noncompliance with the statute.[33]

## III. RESPONSE TO THE DISSENT

At the outset, the dissent claims that the FDIC has more familiarity with the type of transaction that occurred in this case than does this Court. We do not underestimate the FDIC's grasp of what is involved in the liquidation of failed banking institutions. However, we are more familiar with the judicial review process of interpreting statutes and applying them to a set of facts than is an executive agency.

The dissent states that pursuant to 12 USC 1821(d)(2)(G)(i)(I) and (II), the FDIC may merge a failed bank with or transfer a failed bank's assets to a financially healthy bank. It claims that, "[u]nder either provision, the statute provides for transfers by operation of law."[34] This is simply false. Neither statutory provision indicates that either a merger or a transfer takes place by operation of law. The language of 12 USC 1821(d)(2)(G) is in stark contrast with that of 12 USC 1821(d)(2)(A), which explicitly provides that the FDIC succeeds to various property interests by operation of law. The dissent compounds its error by conflating the FDIC's statutory authority to *engage* in a transaction involving a failed bank's assets and liabilities with the *nature* of the transaction itself.[35]

---

[33] See, generally, *Kuschinski*, 277 Mich at 26-27; *Sweet Air*, 275 Mich App at 503; *Jackson*, 162 Mich App at 756.

[34] *Post* at 5.

[35] Similarly, the dissent's focus on which of WaMu's assets the FDIC transferred to defendant is irrelevant. It is the nature of the transaction, not its contents, that informs

16

More problematic, however, is the dissent's failure to analyze the issue most central to this case: what is meant by a transfer by "operation of law." The dissent states as an *ipse dixit* that "a transfer by operation of law need not be involuntary . . . ."[36] It cites not a trace of authority for this fiat. The dissent would also analyze whether a transaction took place by operation of law through the lens of the subjective intent of a related party.[37] This cannot be.[38]

By contrast, in giving meaning to the phrase "operation of law," we have carefully considered decades-old precedent from this Court, as well as consulted a legal dictionary. We defer to these established authorities for the proposition that a transfer that takes place by operation of law is one that occurs unintentionally, involuntarily, or through no affirmative act of the transferee.

---

our conclusion that the transfer did not take place by operation of law.

[36] *Post* at 8.

[37] In effect, the dissent's definitionless approach to this case would *re*define the phrase "operation of law" to mean "as provided by law." The dissent essentially argues that because the FDIC, by statute, may liquidate failed banks, when it does so the resulting transfer occurs by operation of law. Under the dissent's approach, any lawful transaction would constitute a transfer by operation of law. It fails to recognize this contradiction.

[38] The dissent also attempts to undermine our definition of "operation of law" by arguing that transfers accomplished by intestate succession occur by operation of law. It posits that, contrary to our definition of the phrase, those transfers cannot be completed without the affirmative act of a recipient in accepting the property. This position is incorrect. In intestacy succession, if an heir takes no affirmative action, he or she may acquire rights to a decedent's property. It is only if an heir takes the affirmative step of *disclaiming* his or her inheritance that it does not pass to that individual. See MCL 700.2902(1).

17

Finally, the dissent also errs in its alternative argument that defendant is exempt from MCL 600.3204(3) even if the transfer in question did not occur by operation of law. This argument hinges on the belief that defendant did not acquire its interest in plaintiffs' mortgage by assignment. The statute plainly indicates that "a record chain of title shall exist" if the party foreclosing by advertisement "is not the original mortgagee." It is undisputed that defendant is not the original mortgagee. Thus, regardless of *why* no chain of title exists, defendant cannot foreclose by advertisement.[39]

## IV. CONCLUSION

Defendant acquired plaintiffs' mortgage through a voluntary purchase agreement with the FDIC. It follows that it did not acquire the mortgage by operation of law. Accordingly, defendant was required to record its interest in compliance with the provisions of MCL 600.3204 before foreclosing on the property by advertisement. We further hold, differently than did the Court of Appeals, that the sale of the foreclosed property was voidable rather than void *ab initio*. Accordingly, we affirm in part and reverse in part the judgment of the Court of Appeals and remand the case to the trial court for further proceedings. We direct the trial court to expedite its decision on remand.

We do not retain jurisdiction.

Marilyn Kelly
Michael F. Cavanagh
Stephen J. Markman
Diane M. Hathaway

---

[39] The dissent opines that nothing exists that could be recorded in the chain of title evidencing the assignment of interest. This is untrue. For example, defendant could file a copy of the P&A agreement with the register of deeds.

18

# STATE OF MICHIGAN

## SUPREME COURT

EUIHYUNG KIM and IN SOOK KIM,

       Plaintiffs-Appellees,

v

No. 144690

JPMORGAN CHASE BANK, N.A.,

       Defendant-Appellant.

_____

MARKMAN, J. (*concurring*).

I fully concur in the analysis and results of the majority opinion and write separately only to supplement that opinion with the following observations:

First, it must be emphasized that the dissent fails entirely to provide an affirmative definition of the legal term of art that is at the heart of this dispute: "operation of law." The closest the dissent comes is merely stating in the negative that "a transfer by operation of law need not be involuntary . . . ." *Post* at 8. However, it would be more instructive for the development of our law to know what *affirmative* meaning the dissent would ascribe to "operation of law." To the extent that some definition can be inferred from the dissent, that definition is, in my judgment, plainly incorrect. As the majority points out, the dissent essentially seeks to redefine the term "operation of law" to mean "as provided by law." That is, the dissent argues that because the FDIC acted *pursuant to* or in *accordance with* federal statutes, its actions necessarily occurred by "operation of law." Under this theory, it is difficult to envision any transfer of money or property, short of the payment of a bribe or blackmail, that would not occur by "operation of law."

Second, it is difficult to ignore the dissent's repeated references to the fact that the transaction at issue "was not a simple contract for the sale of assets," *post* at 1, but rather constituted a "specialized transaction," see *post* at 3. Although the dissent makes several references to the "special" nature of the transaction, it fails to explain how that nature communicates any *legal* significance. In fact, there is no obvious reason, and the dissent supplies none, for the proposition that the assertedly "special" nature of the instant transaction has any bearing on the determination of whether a transfer is or is not by "operation of law." Certainly, that the transfer was "special" has nothing to do with the *voluntariness* of the transfer. The dissent's emphasis in this regard only has the effect of obscuring the legal realities of this case that *are* relevant.

Third, I believe it deserves emphasis that the dissent's contention that the FDIC's characterization of the transfer should be accorded "respectful consideration" and the authorities cited in support of this contention, *post* at 4 n 10, are inapposite. To begin with, this case is concerned with *Michigan* law, not *federal* law. The critical issue is whether Chase satisfied the *Michigan* "foreclosure by advertisement" statute, which implicates whether the transfer from the FDIC to Chase was accomplished by "operation of law," as that phrase is understood under *Michigan* caselaw. Thus, clearly only issues of *Michigan* law are involved. Furthermore, even if the issues in this case *did* implicate federal law, the FDIC's purported "guidance" is offered through an affidavit submitted by an individual "receiver in charge" for the FDIC. This affidavit is not the statement of the governing board of directors of the FDIC, it is not the statement of any single member of the governing board of directors of the FDIC, and it certainly is not the fruit of

2

rulemaking or adjudication by the FDIC.[1]  As the United States Supreme Court advised in *United States v Mead Corp*, 533 US 218, 229; 121 S Ct 2164; 150 L Ed 2d 292 (2001), "[a] very good indicator of delegation meriting [deference] is [an] express congressional authorization[] to engage in the rulemaking or adjudication process that produces the regulations or rulings for which deference is claimed."  There is an utter absence of any such "indicator" in this case.

Finally, I would offer additional guidance to the trial court concerning the nature of the "prejudice" that plaintiffs must demonstrate in order to set aside the foreclosure. Although a nonexhaustive listing, some of the factors that might be relevant in this demonstration would include the following: whether plaintiffs were "misled into believing that no sale had been had," *Kuschinski v Equitable & Central Trust Co*, 277 Mich 23, 26; 268 NW 797 (1936); whether plaintiffs "act[ed] promptly after [they] became] aware of the facts" on which they based their complaint, *id.*; whether plaintiffs made an effort to redeem the property during the redemption period, *Sweet Air Investment, Inc v Kenney*, 275 Mich App 492, 503; 739 NW2d 656 (2007); whether plaintiffs were "represented by counsel throughout the foreclosure process," *Jackson Investment Corp v Pittsfield Prod, Inc*, 162 Mich App 750, 756; 413 NW2d 99 (1987); and whether defendant "relied on the apparent validity of the sale by taking steps to protect its interest in the subject property," *id.* at 757.

Stephen J. Markman

---

[1] For these reasons, I would also characterize differently than does the majority opinion the "FDIC's affidavit," *ante* at 12 n 25, and the "FDIC's position," *ante* at 11 n 22.

3

STATE OF MICHIGAN

SUPREME COURT


EUIHYUNG KIM and IN SOOK KIM,

      Plaintiffs-Appellees,

v                                 No. 144690

JPMORGAN CHASE BANK, N.A.,

      Defendant-Appellant.

_____

ZAHRA, J. (*dissenting*).

I respectfully dissent from the majority's conclusion that plaintiffs' mortgage did not pass to JPMorgan Chase Bank, N.A., by operation of law. Under federal law, the Federal Deposit Insurance Corporation (FDIC) has broad statutory powers for resolving the business of a failed bank. The FDIC's transfer of plaintiffs' mortgage to Chase was part of a larger, specialized transaction authorized under federal law that was undertaken by the FDIC to resolve the business of Washington Mutual Bank (WaMu), a failed bank. Pursuant to this federal authority, the FDIC was permitted to transfer the assets of WaMu "without any approval, assignment, or consent . . . ."[1] The particular transaction consummated here was not a simple contract for the sale of assets, as characterized by the majority. The majority's conclusions represent a fundamental misunderstanding of the FDIC's authority to liquidate WaMu.

_____

[1] 12 USC 1821(d)(2)(G)(i)(II).

Michigan law has long recognized that a mortgage obtained by operation of law need not be recorded before foreclosure is allowed because the successor mortgagee steps into the shoes of the original mortgagee.[2] Because Chase obtained plaintiffs' mortgage from the FDIC by operation of law, I would hold it exempt from the recordation requirement of MCL 600.3204(3). I would reverse the judgment of the Court of Appeals.

## I. ALL TRANSFERS OF ASSETS UNDER 12 USC 1821(d)(2)(G)(i) OCCUR BY OPERATION OF LAW

The majority correctly concludes that "when the FDIC succeeded to WaMu's assets, which included plaintiffs' mortgage, it did so by clear operation of a statutory provision—12 USC 1821(d)(2)(A). With respect to this transfer, the FDIC acquired plaintiffs' mortgage by operation of law."[3] But I disagree with the majority that the subsequent transfer, from the FDIC to Chase, did not occur by operation of law. In fact, the FDIC transferred WaMu's assets to Chase by operation of another statutory provision—12 USC 1821(d)(2)(G)(i)(II). This provision empowers the FDIC to resolve the business of a failed bank by transferring any asset or liability "without any approval, assignment, or consent with respect to such transfer."[4]

The majority, following the erroneous logic employed by the Court of Appeals, characterizes the transaction between the FDIC and Chase as a simple contractual sale.[5]

---

[2] *Miller v Clark*, 56 Mich 337, 340-341; 23 NW 35 (1885).

[3] *Ante* at 8.

[4] 12 USC 1821(d)(2)(G)(i)(II).

[5] The majority states:

2

Simply put, this characterization fundamentally misunderstands the structure of the agreement. Rather than an ordinary sale of assets, this was a specialized transaction facilitated by the FDIC in accordance with its mandate to resolve the businesses of failed banks.[6] The FDIC, through its statutory powers, enabled a transition in which it stepped into WaMu's shoes as receiver and took possession of WaMu's assets and liabilities without any assignment; then, almost instantaneously, the FDIC transferred substantially all of WaMu's assets and liabilities to Chase. This transfer of assets was intended to be accomplished by operation of law and again without an assignment. The FDIC confirmed as much in its October 2, 2008, affidavit, which it executed contemporaneously with the transfer. In pertinent part, the FDIC stated the following:

> 2. On September 25, 2008, Washington Mutual Bank, formerly known as Washington Mutual Bank, FA ("Washington Mutual"), was closed by the Office of Thrift Supervision and the FDIC was named receiver.
>
> 3. As authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d)(2)(G)(i)(II), the FDIC, as receiver of Washington Mutual, may transfer any asset or liability of Washington Mutual without any approval, assignment, or consent with respect to such transfer.

---

> Under 12 USC 1821, the FDIC is empowered to transfer the assets of a failed bank "without any approval, assignment, or consent . . . ." However, in this case, it did not avail itself of that authority. Instead, the FDIC sold WaMu's assets to defendant pursuant to a purchase and assumption (P&A) agreement. [*Ante* at 3.]

[6] 12 USC 1821(c)(2)(A)(ii) ("The [FDIC] shall be appointed receiver, and shall accept such appointment, whenever a receiver is appointed for the purpose of liquidation or winding up the affairs of an insured Federal depository institution . . . .").

3

4. Pursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of Washington Mutual and JPMorgan Chase Bank, National Association ("JPMorgan Chase"), dated September 25, 2008 (the "Purchase and Assumption Agreement"), JPMorgan Chase acquired certain of the assets, including all loans and all loan commitments, of Washington Mutual.

5. As a result, on September 25, 2008, JPMorgan Chase became the owner of the loans and loan commitments of Washington Mutual *by operation of law*.[7]

This affidavit is not, as the majority suggests, the FDIC's attempt to make, by unilateral declaration, the transaction one completed by operation of law.[8] Rather, it is the FDIC, which undoubtedly has more familiarity with this particular type of transaction than the majority,[9] accurately characterizing the actions it took pursuant to federal law.[10]

---

[7] Emphasis added. The affidavit was executed contemporaneously with the transfer at issue in this case, long before any litigation commenced.

[8] *Ante* at 12 n 25 ("Although the FDIC's affidavit purports that the sale of WaMu's assets to defendant was effected by operation of law, the FDIC may not by unilateral declaration make it so.").

[9] Between October 1, 2000, and December 1, 2012, the FDIC was appointed receiver or conservator in 502 bank failures. See Failed Bank List, FDIC, available at <http://www.fdic.gov/bank/individual/failed/banklist.html> (accessed December 20, 2012).

[10] Though not binding on this Court, the FDIC's characterization of a transfer under its governing statute should be accorded respectful consideration. See *United States v Mead Corp*, 533 US 218, 227; 121 S Ct 2164; 150 L Ed 2d 292 (2001) ("[A]gencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered."); *Skidmore v Swift & Co*, 323 US 134, 140; 65 S Ct 161; 89 L Ed 124 (1944) ("We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."); see also *Wells Fargo Bank v FDIC*, 354 US App DC 6; 310 F3d 202, 208 (2002) ("At the very least, however, because the FDIC is charged with administering this highly detailed regulatory scheme,

4

I cannot accept the majority's conclusion that the FDIC and Chase entered into a simple sale rather than a transfer by operation of law considering that the FDIC's receivership powers—reserved only for the special situation of a bank failure—do not contemplate ordinary sales like the one suggested by the majority. Pursuant to 12 USC 1821(d)(2)(G)(i), the FDIC as receiver may either merge a failed bank with a healthy bank[11] or transfer any asset or liability of the failed bank "without any approval, assignment, or consent with respect to such transfer."[12] Under either provision, the statute provides for transfers by operation of law. If the FDIC attempted to transfer assets of a failed bank *without* relying on one of the provisions of 12 USC 1821(d)(2)(G)(i), it would be acting outside the scope of its statutory authority.[13]

The majority erroneously concludes that a transfer completed by operation of law must be one that occurred involuntarily, ignoring basic business realities. For example,

---

we may resort to its 'body of experience and informed judgment' for guidance to the extent that its position is persuasive."). The majority instead chooses to entirely ignore the FDIC's position that it, in fact, transferred the WaMu assets to Chase by operation of law. While we are ultimately interpreting the requirements of MCL 600.3204(3), the question whether the transfer at issue occurred "by operation of law" truly concerns the character of the transaction as defined by federal law, which the FDIC is tasked with administering. Thus, contrary to the majority's assertion, the issues raised in this case certainly implicate federal law and the majority would do well to give some deference to the contemporaneous transaction documents indicating that this transfer is understood under federal law to have been completed by operation of law.

[11] 12 USC 1821(d)(2)(G)(i)(I).

[12] 12 USC 1821(d)(2)(G)(i)(II).

[13] *Louisiana Pub Serv Comm v FCC*, 476 US 355, 374; 106 S Ct 1890; 90 L Ed 2d 369 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

5

when two companies merge—an action requiring affirmative intent and, often, substantial consideration[14]—the law is settled that the assets of the merging companies vest in the resulting company *by operation of law*.[15] And even the majority admits that a merger results in the transfer of assets by operation of law.[16] Thus, the majority's conclusion that a transfer by operation of law can only occur involuntarily simply does not follow.

Moreover, the majority's conclusion that operation-of-law transfers must be fully involuntary ignores the standards applicable to the most fundamental operation-of-law transactions. Surely the majority would agree that transfers accomplished by intestacy or

---

[14] For example, when AOL and Time Warner merged on January 10, 2000, in the largest merger in history, AOL *purchased* Time Warner for $165 billion to facilitate the merger. Both companies intended to enter the deal, and hefty consideration was paid. See Hansell, *Media Megadeal: The Overview; America Online Agrees to Buy Time Warner for $165 Billion; Media Deal is Richest Merger*, NY Times, January 11, 2000, available at <http://www.nytimes.com/2000/01/11/business/media-megadeal-overview-america-online-agrees-buy-time-warner-for-165-billion.html> (accessed December 20, 2012).

[15] See 12 USC 215(e) ("All rights, franchises, and interests of the individual consolidating banks or banking associations in and to every type of property (real, personal, and mixed) and choses in action shall be transferred to and vested in the consolidated national banking association by virtue of such consolidation without any deed or other transfer."); MCL 450.1724(b) ("The title to all real estate and other property and rights owned by each corporation party to the merger are vested in the surviving corporation without reversion or impairment.").

[16] *Ante* at 11 ("Had a merger occurred . . . , defendant would have a strong argument that it had merely stepped into the shoes of WaMu."). The majority further states that the FDIC could have merged WaMu and Chase pursuant to 12 USC 1821(d)(2)(G)(i)(I) without Chase's consent. But the statute in no way proposes that the FDIC could merge a failed bank and a healthy bank without the healthy bank's consent. On the contrary, it is 12 USC 1821(d)(2)(G)(i)(II) that allows transfers without approval. The majority's concept of a forced merger utterly lacks a statutory basis and further demonstrates the majority's misunderstanding of the FDIC's authority.

6

a joint tenancy occur by operation of law.[17] Yet neither of these traditional operation-of-law transfers can be completed without the affirmative decision of the recipient to accept the property.[18] Michigan law allows a party to disclaim an operation-of-law conveyance.[19] Thus, a transfer by operation of law cannot occur unless the recipient *voluntarily* decides not to exercise his or her right to disclaim the conveyance. Our sister court in New Hampshire eloquently described the rationale behind a right of disclaimer:

> [W]e held that a devisee has the power to renounce a testamentary gift. An intestate heir also may disclaim an intestate share under our common law. The same is true of a right of survivorship in a joint tenancy. . . . The motivating factor permitting renunciation of these interests is that one should not be forced to accept burdensome, unbargained for tenders.[20]

---

[17] See, e.g., *Simon v Simon's Estate*, 158 Mich 256, 259; 122 NW 544 (1909) ("The property of one dying intestate goes, by operation of positive law, . . . to certain persons in certain shares."); *Klooster v City of Charlevoix*, 488 Mich 289, 303; 795 NW2d 578 (2011) ("When one of only two joint tenants dies, an estate in land passes by operation of law to the survivor.").

[18] It is also worth noting that both types of transfers occur pursuant to statutory authority. MCL 700.2101(1) ("Any part of a decedent's estate not effectively disposed of by will passes by intestate succession to the decedent's heirs *as prescribed in this act* . . . .") (emphasis added); Title of 1925 PA 126, MCL 557.81 *et seq*. ("An act to provide for the payment to the survivor of husband and wife, of land contracts, and of notes and other obligations secured by a mortgage, given as part of the purchase price of lands held as a tenancy by the entirety, and the vesting of the title of the mortgage or land contract in the survivor."); MCL 491.616(2) (creating a joint tenancy in multiperson bank accounts unless specified otherwise).

[19] MCL 700.2901 to 700.2912.

[20] *In re Lamson Estate*, 139 NH 732, 733-734; 662 A2d 287 (1995) (citations omitted); see also *Nat'l City Bank of Evansville v Oldham*, 537 NE2d 1193, 1197 (Ind App, 1989) ("Generally speaking, legal title to real property devised by will vests in the devisee upon the decedent's death by operation of law. It has long been recognized, however, that a person cannot be forced to accept property against his will and therefore a transfer of title

By similar logic, the fact that Chase could have refused, but voluntarily accepted, the transfer does not destroy its character as an operation-of-law transaction.

Having established that a transfer by operation of law need not be involuntary, I have no trouble concluding that the instant transaction was completed by operation of law. I am also not troubled by the conclusion that the FDIC/Chase transaction was for all intents and purposes the equivalent of a merger. By this transaction, Chase absorbed substantially all of WaMu's assets and liabilities. In a September 25, 2008, press release announcing the transaction, FDIC Chairman Sheila C. Bair called the transaction "simply a combination of two banks."[21] Chase did not sort through the various assets of WaMu and pick and choose only the most appealing items; it absorbed the entire bank except for very select assets and liabilities that remained with the receiver.[22] The first page of the

---

is not complete until it is accepted by the recipient.") (citations omitted); 20 Am Jur 2d, Cotenancy and Joint Ownership, § 4 ("Under the Uniform Disclaimer of Property Interests Act, a surviving joint tenant may disclaim the transfer of any property or interest by right of survivorship by delivering a written disclaimer. The purpose of allowing such disclaimer is that one should not be forced to accept burdensome, unbargained-for tenders.").

[21] FDIC, Press Release, *JPMorgan Chase Acquires Banking Operations of Washington Mutual*, September 25, 2008, available at <http://www.fdic.gov/news/news/ press/2008/pr08085.html> (accessed December 20, 2012) (emphasis added).

[22] See, e.g., schedule 3.5 of the purchase and assumption (P&A) agreement, captioned "Certain Assets Not Purchased" (excluding only payouts on or refunds for insurance policies, actions or judgments against directors or underwriters of the failed bank, leased premises, fixtures, and equipment, and criminal/restitution orders in favor of the failed bank from the agreement); schedule 2.1 of the P&A agreement, captioned "Certain Liabilities Not Assumed" (excluding only preferred stock and pending litigation against WaMu, subordinated and senior debt, some employee benefit plans sponsored by WaMu's holding company, and certain deferred compensation and consulting agreements maintained by WaMu).

purchase and assumption (P&A) agreement indicates that Chase acquired much more than a loan portfolio, stating that with the FDIC acting as the conduit, it received "substantially all of the assets and assum[ed] all deposit and substantially all other liabilities" of WaMu.[23]  And while the P&A agreement established the framework for the transfer, the actual transaction was completed under the FDIC's statutory authority to transfer assets and liabilities "without any approval, assignment, or consent . . . ."[24] Having received the assets and liabilities without any assignment, Chase stepped into WaMu's shoes and began occupying WaMu's legal status.  While this conclusion is perhaps the result of a legal fiction, like a merger, this is the manner in which the law treats these transactions.  Accordingly, no further formalities were necessary to vest the rights Chase acquired from WaMu because, as with a merger, they vested upon completion of the deal.

At its heart, the majority's and the Court of Appeals' errors are in redefining this transaction, giving short shrift to the specialized context in which it occurred.  The FDIC and Chase did not execute a simple contractual sale; it was a transfer of assets and liabilities consummated without any assignments that only could have been completed under the FDIC's statutory authority for resolving failed banks.  Accordingly, I would hold that Chase acquired plaintiffs' mortgage by operation of law.[25]

---

[23] See also Brooks, *The Federal Deposit Insurance System: The past and the potential for the future*, 5 Ann R Banking L 111, 112 (1986) ("A purchase and assumption transaction is a merger of the failing bank into a successful bank; the successful bank assumes all deposit liabilities of the failing bank.").

[24] 12 USC 1821(d)(2)(G)(i)(II).

[25] Alternatively, as fully explained in part II of this opinion, I question whether the

## II.  THE RECORDING REQUIREMENT OF MCL 600.3204(3) DOES NOT APPLY TO TRANSACTIONS PROPERLY COMPLETED WITHOUT ASSIGNMENT, INCLUDING MORTGAGES ACQUIRED BY OPERATION OF LAW

MCL 600.3204 provides the requirements for foreclosure by advertisement.  MCL 600.3204(1) lists the four general requirements before a mortgagee can foreclose:

> (a) A default in a condition of the mortgage has occurred, by which the power to sell became operative.

> (b) An action or proceeding has not been instituted, at law, to recover the debt secured by the mortgage or any part of the mortgage; or, if an action or proceeding has been instituted, the action or proceeding has been discontinued; or an execution on a judgment rendered in an action or proceeding has been returned unsatisfied, in whole or in part.

> (c) The mortgage containing the power of sale has been properly recorded.

> (d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage.

MCL 600.3204(3) states an additional requirement:

> If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale under [MCL 600.3216] [setting the conditions for the sheriff's sale] evidencing the assignment of the mortgage to the party foreclosing the mortgage.

Chase was exempt from the requirements of MCL 600.3204(3) because it obtained the mortgage by operation of law.  The key phrase in making this determination is "evidencing the assignment."  If there has been no assignment—i.e., if the mortgage was

---

majority's conclusion that the transfer did not occur by operation of law resolves the matter.  Indeed, the operative recording statute, MCL 600.3204(3), only requires the recordation of mortgages that have been assigned, and pursuant to 12 USC 1821(d)(2)(G)(i)(II), the mortgage here was transferred *without* an assignment.

transferred by operation of law—then there can be no chain of title because the party holding the mortgage is, by law, the original mortgagee. This is so even if the party holding the mortgage was not the party that actually recorded the mortgage. In other words, the statute implies that when no assignment has occurred, the party holding the mortgage has stepped into the shoes of the original mortgagee. When there has been no assignment of a mortgage, there can be no assignment to record. Accordingly, because Chase acquired the plaintiffs' mortgage by operation of law instead of by assignment, and was thus legally considered the original mortgagee, it was not required to record anything in the chain of title.

Michigan law has long recognized that only transfers completed by assignment need to be recorded before foreclosure by advertisement is permitted. In the 1885 decision of *Miller v Clark*, this Court analyzed the foreclosure-by-advertisement statute and determined that mortgages obtained by operation of law need not be recorded before foreclosure by advertisement is permitted.[26] In *Miller*, the mortgagee was an individual who died with the mortgage passing as part of his estate to the guardian of his heirs.[27] The guardian foreclosed on the mortgage without recording it.[28] This Court, in discussing whether the recording requirement applied to the peculiar way that the guardian came to possess the mortgage *without* an assignment, held that "[t]he

---

[26] *Miller*, 56 Mich at 337. The foreclosure-by-advertisement statute in effect in 1885, 1871 CL 6913, contained different language than the current statute but similarly required the recordation of mortgage assignments before foreclosure was permitted.

[27] *Id.* at 339-340.

[28] *Id.* at 340.

11

assignments which are required to be recorded are those which are executed by the voluntary act of the party, and *this does not apply to cases where the title is transferred by operation of law . . . .*"[29] So if there is no assignment to record because the mortgage passed by operation of law, then the recording requirement does not apply.[30] Because Chase obtained the plaintiffs' mortgage without an assignment pursuant to the FDIC's

---

[29] *Id.* at 340-341 (emphasis added). The majority relies on this quote to erroneously conclude that a transfer by operation of law must be involuntary. But *Miller* made no such determination. The quoted language only held that voluntary *assignments* must be recorded, making no determination whatsoever with respect to voluntary *operation-of-law* transactions like corporate mergers or the transfer that took place here.

The majority also concludes that the rule of *Miller* does not control because the recording requirement has been modified and the "triggering mechanisms for recordation" are different now than when *Miller* was decided, with the mechanism now being only that the foreclosing party "is not the original mortgagee." As explained earlier, this errant focus on the "triggering mechanisms" prevents the majority from viewing the statute as a whole and ignores the fact that MCL 600.3204(3) still only requires a recording to exist "evidencing the assignment." Again, one cannot evidence an assignment that does not exist and need not exist to effectuate the transfer. An assignment is thus necessary *both* under MCL 600.3204 as it exists now and as its predecessor provided when *Miller* was decided.

[30] Michigan's Attorney General reiterated the *Miller* holding in 2004, stating that "[a] mortgagee cannot validly foreclose a mortgage by advertisement unless the mortgage and all assignments of that mortgage (*except those assignments effected by operation of law*) are entitled to be, and have been, recorded." OAG, 2003-2004, No 7147, p 93 (January 9, 2004) (emphasis added). When the Attorney General made this statement, the recording requirement was found in MCL 600.3204(1)(c) but used the same language as the current statute. MCL 600.3204(1)(c), as amended by 1994 PA 397, provided in relevant part:

> The mortgage containing the power of sale has been properly recorded and, if the party foreclosing is not the original mortgagee, a record chain of title exists evidencing the assignment of the mortgage to the party foreclosing the mortgage.

12

statutory authority, MCL 600.3204(3) did not require Chase to record the mortgage before foreclosing.

Alternatively, it is not at all clear that the transfer must even be characterized as one completed by operation of law to be exempt from the recordation requirement of MCL 600.3204(3). Indeed, the statutory language itself does not explicitly exempt transfers completed by operation of law; instead, it requires recordation when there *is* an assignment.[31] So in 1885, when this Court held that an operation-of-law transaction was exempt from the recordation requirement, it did so not because the transaction *was* completed by operation of law but because the transaction *was not* an assignment.[32] Thus, even if the instant transaction was not by operation of law per se, it would still be exempt from the recording statute if no recordable assignment existed. And indeed, pursuant to 12 USC 1821(d)(2)(G)(i)(II), the FDIC transferred WaMu's assets to Chase without an assignment. So even accepting the majority's conclusion that this was *not* a transfer by operation of law, MCL 600.3204(3) would still not apply because no assignment existed and none was necessary to complete the transfer.[33]

---

[31] The original statute, 1871 CL 6913, required recording if the mortgage had been assigned; the current statute, MCL 600.3204(3) requires a recording "evidencing the assignment."

[32] See *Miller*, 56 Mich at 337.

[33] In responding to this alternative argument, the majority states that a record chain of title must exist before foreclosure is permitted, yet it does not say what should be recorded in the chain of title to "evidenc[e] *the assignment*" as required by MCL 600.3204(3). Here, no assignment occurred, so nothing exists that can be recorded in the chain of title. Indeed, under the majority's construction, Chase could never satisfy MCL 600.3204(3) because it is not the original mortgagee, but it also lacks the ability to record an assignment in the chain of title.

## III. CONCLUSION

By redefining the character of the transaction between the FDIC and Chase, the majority, like the Court of Appeals before it, erroneously concludes that it was an ordinary contractual sale rather than a specialized transfer by operation of law. In reality, the transaction was possible only because of the FDIC's special statutory powers for resolving the business of a failed bank like WaMu. Moreover, Chase was not required to record the mortgage before foreclosing because it obtained the mortgage by operation of law and stepped into WaMu's shoes as the original mortgagee. Thus, the recording requirement of the foreclosure-by-advertisement statute was inapplicable. Accordingly, I respectfully dissent and would reverse the judgment of the Court of Appeals.[34]

Brian K. Zahra
Robert P. Young, Jr.
Mary Beth Kelly

---

[34] Because I conclude that no defect existed in the foreclosure, it is unnecessary for me to decide whether a defect in the foreclosure renders the foreclosure sale voidable or void *ab initio*. However, because the majority reaches this issue, I note my agreement with the majority's reasoning on this issue and conclusion that "defects or irregularities in a foreclosure proceeding result in a foreclosure that is voidable, not void *ab initio*." *Ante* at 15.